## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIANNA TABLER, on behalf of herself and all others similarly situated,<br><br>                         Plaintiff,<br><br>v.<br><br>PANERA, LLC, PANERA BREAD COMPANY, and JAB HOLDING COMPANY, S.A.R.L.<br><br><br>                       Defendants. | Case No. 19-cv-1646<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

On behalf of herself and all others similarly situated, Plaintiff Brianna Tabler, by and through her counsel, brings this action under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (the "UCL"), the False Advertising Law, Cal. Bus. and Prof. Code § 17500 (the "FAL"), the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA"), and common law, brings this action against Defendants Panera, LLC, its parent company Panera Bread Company, and its parent company JAB Holding Company, S.A.R.L. (collectively "Panera" or the "Panera Defendants") regarding the deceptive labeling, marketing, and sale of certain bread products (the "Products," as further defined below) as "clean" despite the fact that the Products contain synthetic biocide residue and other contaminants. Plaintiff Tabler alleges the following based upon information, belief, and the investigation of her counsel:

## INTRODUCTION

1.  Due to concerns about health, sustainability, and the use of synthetically created chemicals in the production of food, more and more consumers are considering how their food is

farmed, processed, and prepared.

2.      As a result, demand has increased for food products that provide assurances about how they are produced and prepared—that is, products that are free from unnatural ingredients, synthetic chemicals, or other remnants of artificial or extensive processing. Consumers, as Panera knows, are willing to pay more for products marketed in this way than they are willing to pay for competing products that do not provide such assurances.

3.      In particular, there is a growing desire among consumers to purchase and consume "clean" foods, which consumers understand to be foods free of artificial ingredients, especially pesticides.[1]

4.      Panera produces sandwiches, baked goods, and other prepared foods that are sold to consumers through Panera's retail outlets or restaurants and are advertised and promoted as "clean."

5.      In contrast to Panera's representations, bread products sold at its retail outlets, including but not limited to Panera's Whole Grain Bagel (the "Products"),[2] contain the residue glyphosate, a synthetic biocide suspected (including by consumers) to have detrimental health effects.

6.      In sum, Panera is deceiving consumers into believing that the Products are of a higher quality, free from synthetic chemicals, or free from chemical residues from the production process when they are not.

---

[1] *See, e.g.*, Cargill, Inc., *Transparency and Simplicity: The New Normal in Product Development* 8 (2017), https://www.cargill.com/doc/1432106811290/clean-label-white-paper.pdf (finding in consumer study that more than half of respondents look to "clean" foods in order to avoid pesticides and other artificial chemicals).

[2] Discovery may demonstrate that additional Panera food items are within the scope of this Complaint. Plaintiff reserves the right to amend this complaint to include additional food items identified through the course of discovery, which are believed to include, at least, the Mediterranean Veggie Sandwich, Oatmeal Raisin with Berries Cookie, Oatmeal with Apple Chips and Pecans, and Greek Yogurt with Mixed Berries.

COMPLAINT

7.     No reasonable consumer who sees Panera's representations that its food is "clean" would expect the Products to contain residues of an unnatural biocide.

8.     By deceiving consumers about the nature, quality, and/or ingredients of the Products, Panera is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profits.

9.     Because Panera's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Plaintiff Tabler brings this deceptive advertising case on behalf of herself and all others similarly situated, and seeks monetary and injunctive relief, including an order halt to Defendants' false marketing and sale of the Products.

## FACT ALLEGATIONS

10.     Plaintiff Tabler brings this suit against Defendants based on misrepresentations and omissions committed by Defendants regarding the Products, which Defendants falsely and deceptively label and market as "100% clean" and/or as "clean," when in fact the Products contain glyphosate, which is not present in truly "clean" foods.

11.     Panera's marketing of the Products is false and deceptive because the Products contain residue of the synthetic biocide glyphosate, the presence of which does not comport with consumers' perceptions of "clean" food.

12.     Panera knows that American consumers increasingly and consciously seek out, and will pay more for, "clean" foods.

13.     Accordingly, Panera cultivates an image of the Products as a "clean" alternative for consumers who wish to avoid synthetic chemicals and artificial or unsafe additives.

COMPLAINT

**A.     The Presence of Glyphosate in the Products Renders Panera's Advertising False and Deceptive.**

14.     Panera represents that the Products are a "clean" alternative to other fast-casual or fast-food options for consumers who wish to avoid synthetic chemicals.

15.     In addition to featuring prominently in Defendants' advertising and marketing materials, these representations are ubiquitous at the point of sale of the Products—on bags, signs, and labels throughout Panera's physical locations.

16.     For example, signs and placards displayed in Panera's retail outlets or restaurants contain statements such as "Food should be clean. No artificial colors, preservatives, sweeteners, flavors, or anything else you wouldn't want to serve your family," as seen in the representative images below.





17.     Additionally, bags include statements such as "100% clean food: No artificial flavors sweeteners, preservatives / No colors from artificial sources," as seen in the representative image below.



18.     Panera also uses a number of other representations to portray an image of "clean," chemical-free food, such as the earthy green and brown color schemes throughout its stores, webpages, and on its logo.

19.     Panera's representations are intended to, and do, portray to consumers that, at the very least, the ingredients in the Products do not contain residue of non-food items such as synthetic chemicals used during the ingredients' growing, harvest, or processing.

20.     The term "clean" is becoming more popular in the food industry as consumers

demand food without chemicals, and more transparency about how their food is made.[3] Clean food implies that the food is "free of artificial preservatives, coloring, irradiation, synthetic pesticides, fungicides, ripening agents, fumigants, drug residues and growth hormones."[4]

21.     Contrary to the representations made by Panera, Tests conducted by an independent laboratory using liquid chromatography mass spectrometry (LCMC) has revealed that the Products contain residue of glyphosate, a synthetic biocide.

22.     Glyphosate was invented by the agrochemical and agricultural biotechnology corporation Monsanto, which began marketing the herbicide in 1974 under the trade name Roundup.[5]

23.     Glyphosate is derived from the amino acid glycine.

24.     To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

25.     Glyphosate is an artificial chemical.

26.     Products with detectible glyphosate residue are not "clean."[6]

27.     Over the past several years, consumers have become increasingly conscious of the detrimental effects that glyphosate may have on human health.

---

[3] *See, e.g.*, Ed White, *Consumer Demand Increasing for "Clean" Food*, The Western Producer (Mar. 29, 2018), https://www.producer.com/2018/03/consumer-demand-increasing-clean-food/; Cargill, *supra* note 1, at 4 ("The market for products viewed as 'clean label' has seen a substantial rise in recent years[.]"); Nielsen Co., *It's Clear:      Transparency      Is      Winning      in      the      Retail      Market*,      9      (2017), https://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2017-reports/nielsen-clean-label-report-aug-2017.pdf (identifying levels of growth in market for "clean" foods).
[4]     Susan     Weissman,     *What     Is     Clean     Food*,     Huffington     Post     (Dec.     6,     2017), https://www.huffpost.com/entry/what-is-clean-food_b_446035.
[5] *See* Shannon Van Hoesen, *Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History*, Environmental Working Group (Feb. 2, 2016), https://www.ewg.org/release/study-monsanto-s-glyphosate-most-heavily-used-weed-killer-history.
[6] *See, e.g.*, Cargill, *supra* note 1, at 8 (finding in consumer study that more than half of respondents look to "clean" foods in order to avoid pesticides and other artificial chemicals).

28.     Reasonable consumers do not expect an artificial chemical with suspected health concerns to be found in a product represented as "100% clean" and "clean"; as such, Panera misrepresents the Products when it calls them "clean."

29.     Nowhere on Panera's website, or in its retail outlets, or in its biannual Responsibility Report[7] does Panera clarify that artificial biocide residue is present in the Products despite the "clean" marketing claims. Given the affirmative representations of "clean" products, these are material omissions in the marketing of the Products.

**B.    Panera Has Extensive Knowledge of Its Entire Supply Chain and Knows Its Products Are Contaminated With Residues.**

30.     Panera publishes a biannual "Responsibility Report" in order to "to share [its] commitments and provide transparency on [its] responsibility journey."[8]

31.     This report discusses a wide array of topics about the company, the food, and the packaging used in the stores. The report also details the extensive knowledge that Panera has of, and its close relationships with, each of its suppliers, including knowledge of their farming and food preparation processes.

32.     The Responsibility Report makes clear that Panera is aware of the way its food is grown and processed, and has knowledge of the methods that its farmers and sources use in raising their animals and crops. Panera states, "It's important to understand our entire food system—how food is raised and grown, how it is produced and manufactured, and how it is prepared."[9]

33.     The Responsibility Report details the great care and attention Panera pays to its

---

[7] Panera Bread, *2014 Responsibility Report* (Feb. 22, 2015), https://www.panerabread.com /panerabread/documents/press/2015/PaneraBread_CSR_2014.pdf ("Responsibility Report").
[8] Panera Bread, *Food Promise: Transparent*, https://www.panerabread.com/en-us/our-beliefs/our-food-policy/transparent-menu.html (last visited Nov. 2, 2018).
[9] *Responsibility Report*, *supra* n.8, at 4.

entire supply chain and food growing/preparing process, stating:

> Our commitment to food quality and safety begins before food even reaches the bakery-cafes. Each step of the supply chain—from the source through shipping, manufacturing and distribution, all the way to the bakery-cafes where the final food preparation is done—is carefully monitored by members of our quality assurance team to help ensure that quality and safety are maintained.[10]

34.     Panera's Responsibility Report emphasizes transparency so that patrons can make informed decisions about what they consume. Panera states, "We work with suppliers, farmers and fishermen to provide traceability to the source, and are actively involved in ensuring quality, taste and freshness."[11]

35.     Additionally, in the Responsibility Report, Ron Shaich, the founder and CEO of Panera, explicitly states that Panera is making "conscious choices about the food [it] serve[s]."[12]

36.     Nowhere in this transparency report is it mentioned that an artificial biocide is used on the food and remains at measurable levels on food consumed by Panera's patrons.

## C.     Panera Has Deceived Consumers and Is Aware That Its Representations Were False.

37.     Panera holds itself out to the public as a trusted expert in the production of "clean" food.

38.     Panera knows what representations it makes regarding the Products.

39.     Panera maintains "one-on-one" relationships[13] with its suppliers and is "actively

---

[10] *Id.* at 21. Panera reiterates this point in its updated Responsibility Report for 2015-2016, stating, "We want to know where our ingredients come from and have a long history of working with and monitoring our suppliers to ensure there is 'back-to-source' transparency. Our supplier relationships were critical to helping us achieve our clean commitment—and they are a significant part of how we continue to ensure all elements of our Food Policy are maintained." Panera Bread, *2015-2016 Responsibility Report* (2017), 14, https://www.panerabread.com/panerabread/documents/press/2017/panera-bread-csr-2015-2016.pdf.

[11] *Responsibility Report*, *supra* n.8, at 33.

[12] *Id.* at 20.

[13] *Id.* at 28.

involved" in their sourcing and each stage of the supply chain,[14] and thus knows how the Products are produced, including that glyphosate enters the Products sometime during the production process.

40.     The source of the glyphosate in the Products is known to Panera and its suppliers.

41.     Consumers frequently rely on manufacturers, their reputation, and the information provided on manufacturers' websites in making purchase decisions, especially in purchasing food.

42.     Reasonable consumers lack the information and scientific knowledge necessary to ascertain the true source, quality, and nature of ingredients in the Products.

43.     Reasonable consumers must, and do, rely on Panera honestly to report what the Products contain and how they are made.

44.     Reasonable consumers are misled and deceived by Panera's "clean" representations into believing that they are purchasing products that are "clean," and free from non-food and artificial chemical residues, including from glyphosate.

45.     Panera made these false, misleading, and deceptive representations, and omitted the information that would counter them, knowing that consumers would rely upon the representations and omissions in purchasing the Products.

46.     In making the false, misleading, and deceptive representations and omissions at issue, Panera knew and intended for consumers to purchase the Products when consumers might otherwise purchase competing products.

47.     In making the false, misleading, and deceptive representations and omissions at issue, Panera also knew and intended that consumers would pay more for products that were

---

[14] *Id.* at 33.

represented as "clean," furthering Panera's private interest of increasing sales of its products and decreasing the sales of foods that truly fit consumers' understanding of "clean" foods and/or glyphosate-free products that are truthfully marketed by its competitors.

48.     Upon information and belief, Panera has profited enormously from consumers in California based on its falsely marketed products and its carefully orchestrated image.

49.     Panera's conduct in representing the Products as being "clean" deceived and/or is likely to deceive the public.

50.     Consumers cannot discover the true nature of the Products even by reading their packaging or visiting Panera's website marketing the Products. The Product packaging, signage at the point of sale, and Panera's website and Responsibility Report do not state anywhere that the Products may artificial biocide residue despite the "clean" marketing claims.

51.     Discovery of the true nature of the ingredients requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

52.     The production process Panera uses for the Products, including what would account for the presence of glyphosate residue, is known to Panera and its suppliers but has not been disclosed to Plaintiff Tabler or other consumers.

53.     To this day, Panera continues to conceal and suppress the true nature, identity, source, and method of production of the Products.

54.     Panera's concealment tolls applicable statute of limitations.

55.     Upon information and belief, Panera has failed to remedy the problems with the Products, continues to represent falsely that the products are "100% clean" and "clean," and/or may introduce additional products also falsely represented as "100% clean" or "clean," thus causing future harm to consumers.

56.     Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, represented as "100% clean" or "clean" while omitting any reference to the presence of synthetic chemical residue.

57.     Defendants have failed to provide adequate relief to purchasers as of the date of this complaint.

58.     Plaintiff Tabler contends that the Products were sold pursuant to unfair and unconscionable trade practices, because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to consumers.

59.     Defendants' statements and other representations convey a series of express and implied claims and/or omissions that Defendants know are material to the reasonable consumer in making a purchasing decision, and that Defendants intended for consumers to rely upon when choosing to purchase the Products.

60.     Accordingly, Plaintiff Tabler seeks declaratory relief in the form of an order declaring Defendants' conduct to be unlawful, as well as injunctive relief putting an end to Defendants' misleading and unfair business practices, including a change to the current Products' representations, packaging, labels and marketing, or a reformulation of the Products so that the Products no longer contain glyphosate residue.

## JURISDICTION AND VENUE

61.     This Court has personal jurisdiction over the parties in this case. Plaintiff Tabler is a citizen of California within this District. Defendants purposefully avail themselves of the laws of California to market, promote, distribute, and sell the Products to consumers in California and this District.

62.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which under the provisions of the Class Action Fairness Act, explicitly provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class comprises at least 100 members, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff Tabler alleges that the total claims of individual members of the proposed Class (as defined herein) exceed $5,000,000.00 in the aggregate, exclusive of interest and costs.

63.     Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District.

## PARTIES

64.     Plaintiff Brianna Tabler is an individual consumer who, at all relevant times, was a citizen of Santa Clara County, California.

65.     During the class period, Plaintiff Tabler purchased Panera bread products including the Whole Grain Bagel on multiple occasions from Panera retail outlets or restaurants located at 575 Grand Avenue, San Marcos, California; 3851 State Street, Santa Barbara, California; and 307 Gellert Boulevard, Daly City, California.

66.     In deciding to make her purchases, Plaintiff Tabler saw, relied upon, and reasonably believed Defendants' representations that the Products were "100% clean" or "clean."

67.     At all times mentioned herein, Panera, LLC was and is a limited liability company formed under the laws of England and maintains a domestic headquarters in New York City.

Panera Bread Company was and is a company formed under the laws of the state of Delaware that maintains its headquarters in St. Louis, Missouri. Defendant JAB Holding Company was and is a corporation headquartered in Germany. Defendants were and are, at all relevant times, engaged in commercial transactions throughout California.

68.     The Panera Defendants manufacture and/or cause the manufacture of the Products and market and distribute the Products in retail outlets in California.

## CLASS ALLEGATIONS

69.     Plaintiff Tabler brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated individuals within California (the "Class"), defined as follows:

> All consumers who purchased the Products within California during the statute of limitations period and until the date of class certification.

70.     Excluded from the Class are (1) Defendants, any entity or division in which a Defendant has a controlling interest, and Defendants' legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

71.     There are substantial questions of law and fact common to all members of the Class, which will predominate over any individual issues. These common questions of law and fact include, without limitation:

> (a) whether Defendants' practices and representations related to the marketing, labeling and sales of its Products were unfair, deceptive, fraudulent, and/or unlawful in any respect;
>
> (b) whether Defendants' conduct as set forth above injured Plaintiff Tabler and Class members;

(c) whether Plaintiff Tabler and Class members are entitled to injunctive relief;

(d) whether Defendants advertised the Products with the intent not to sell them as advertised in violation of California Civil Code § 1770(a)(9);

(e) whether Defendants represented on packaging for the Products that the Products had characteristics, ingredients, uses, or benefits that they do not have in violation of California Civil Code §1770(a)(5);

(f) whether Defendants represented the Products as of a particular standard, quality, or grade, when they were of another, in violation of California Civil Code §1770(a)(7);

(g) whether Defendants are subject to liability for violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1784;

(h) whether Defendants have violated California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500-17536;

(i) whether Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; and

(j) whether the Class is entitled to an award of restitution pursuant to California Business and Professions Code § 17203.

72.     Plaintiff Tabler's claims are typical of the claims of the Class. Plaintiff Tabler is a member of a well-defined class of similarly situated persons, and the members of the Class were similarly affected by Defendants' conduct and are owed the same relief, as alleged in this Complaint. Members of the Class are ascertainable from Plaintiff Tabler's description of the class, Defendants' records, and records of third parties accessible through discovery.

73.     Plaintiff Tabler will fairly and adequately protect the interests of the Class and has

no interests which are antagonistic to the claims of the Class. Plaintiff Tabler will vigorously pursue the claims of the Class.

74.     Plaintiff Tabler has retained counsel who are competent and experienced in consumer protection litigation, including class actions relating to false advertising. Plaintiff Tabler's counsel have successfully represented plaintiffs in complex class actions and currently represent other plaintiffs in several similar complex class action litigations involving false advertising.

75.     A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff Tabler and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case and as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Tabler's and the Class members' claims together is manageable. Unless the Class is certified, Defendants will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

77.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

78.     The prerequisites to maintaining a class action for injunctive or equitable relief are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

79.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

80.     Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff Tabler seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic policies and practices make declaratory relief appropriate with respect to the Class as a whole.

81.     Plaintiff Tabler knows of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance of a class action.

## CAUSES OF ACTION

## COUNT I

### (Unfair and Deceptive Acts and Practices in Violation of the California Consumers Legal Remedies Act, on Behalf of the Class)

82.     Plaintiff Tabler incorporates by reference and realleges herein all paragraphs alleged above.

83.     This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA").

84.     Plaintiff Tabler and other members of the Class are "consumers," as the term is

defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

85.     Plaintiff Tabler, the other members of the Class, and Defendants have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

86.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

87.     As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff Tabler and the other members of the California Subclass that the Products are "clean."

88.     As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

89.     Plaintiff Tabler seeks an order of this Court that includes, but is not limited to, an order requiring Defendants to cease and/or refrain from making representations that the Products are "100% clean" or "clean."

90.     Plaintiff Tabler and the other Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

91.     The unfair and deceptive acts and practices of Defendants, as descried above, present a serious threat to Plaintiff Tabler and other members of the Class.

92.     CLRA § 1782 NOTICE. On February 1, 2019, a CLRA demand letter was sent to Defendants via certified mail that provided notice of Defendants' violation of the CLRA and demanded that within thirty (30) days from that date, Defendants correct, repair, replace, or

otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, a complaint seeking damages in accordance with the CLRA would be filed. Defendants received the letter on February 4, 2019, but have failed to comply with the letter. Accordingly, pursuant to California Civil Code § 1780(a)(3), Plaintiff Tabler, on behalf of herself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

## COUNT II

### (Violations of California's False Advertising Law,
### on Behalf of the Class)

93.     Plaintiff Tabler incorporates by reference and realleges herein all paragraphs alleged above.

94.     As alleged more fully above, Defendants have falsely advertised the Products by falsely claiming that the Products are "100% clean" and/or "clean."

95.     At all material times, Defendants engaged in a scheme of offering the Products for sale to Plaintiff Tabler and the other members of the Class within the State of California through, *inter alia*, commercial marketing and advertising, the Internet, the Products' packaging and labeling, and other promotional materials and offers for sale for the Products.

96.     The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*

97.     Said advertisements and inducements were made within the State of California and come within the definition of advertising contained in the FAL in that such promotional materials were intended as inducements to purchase the Products and are statements disseminated by

Defendants to Plaintiff Tabler and the other Class members that were intended to reach Plaintiff Tabler and the other Class members. Defendants knew, or in the exercise of reasonable care, should have known, that these representations were misleading and deceptive.

98.     The above acts of Defendants did and were likely to deceive reasonable consumers, including Plaintiff Tabler and the other members of the Class, by obfuscating the nature, quality, and ingredients of the Products, in violation of the "misleading" prong of the FAL.

99.     Plaintiff Tabler and the other members of the Class have suffered injury in fact and have lost money or property as a result of Defendants' violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*

100.     Pursuant to California Business and Professions Code §§ 17203 and 17535, Plaintiff Tabler and the Class seek an order of this Court that includes, but is not limited to, requiring Defendants to refrain from making representations that the Products are "100% clean" or "clean" through, *inter alia*, commercial marketing and advertising, the Internet, the Products' packaging and labeling, and other promotional materials and offers for sale for the Products.

## COUNT III

### (Violation of California's Unfair Competition Law,
### on Behalf of the Class)

101.     Plaintiff Tabler incorporates by reference and realleges herein all paragraphs alleged above.

102.     By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class as a whole, by engaging in unlawful, fraudulent, and unfair conduct.

103.     Defendants have violated the UCL's proscription against engaging in *unlawful*

conduct as a result of:

      (a)  Violations of the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9), as alleged above; and

      (b)  Violations of the FAL, Cal. Bus. & Prof. Code § 17500 *et seq.*, as alleged above.

104.    Defendants' acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

105.    As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of Products is likely to deceive reasonable consumers. Indeed, Plaintiff Tabler and the other members of the Class were unquestionably deceived regarding the "clean" qualities of the Products, as Defendants' marketing, advertising, packaging, and labeling of the Products misrepresent or omit the true facts concerning the benefits of the Products. Those acts are fraudulent business practices.

106.    Defendants' acts and practices described above also violate the UCL's proscription against engaging in *unfair* conduct.

107.    Plaintiff Tabler and the other Class members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and labeling or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled Products.

108.    There is no benefit to consumers or competition from deceptively marketing and labeling products like the Products, which purport to be natural when these unqualified claims are false.

109.    Plaintiff Tabler and the other Class members had no way of reasonably knowing

that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

110.   The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives that exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Tabler and the other members of the Class.

111.   Defendants' violations of the UCL continue to this day.

112.   Pursuant to California Business and Professional Code § 17203, Plaintiff Tabler and the California Subclass members seek an order of this Court that, *inter alia*, requires Defendants to:

(a) remove and refrain from making representations on the Products' packaging or elsewhere that the Products are "100% clean" or "clean";

(b) provide restitution to Plaintiff Tabler and the other Class members;

(c) disgorge all revenues obtained as a result of violations of the UCL; and

(d) pay the attorney fees and costs of Plaintiff Tabler and the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Tabler respectfully requests that the Court enter judgment in her favor and in favor of the Class as follows:

A.   An order certifying the proposed Class; appointing Plaintiff Tabler as representative of the Class; and appointing Plaintiff Tabler's undersigned counsel as class counsel for the Class;

B.   A declaration that Defendants are financially responsible for notifying Class members of the pendency of this suit;

C.　　An order requiring proper, complete, and accurate representation, packaging, and labeling of the Products;

D.　　An award of disgorgement pursuant to California Business and Professions Code §§ 17203 and 17535 for members of the Class;

E.　　An order enjoining Defendants' unlawful and deceptive acts and practices, pursuant to California Business and Professions Code §§ 17203 and 17535, and requiring that Defendants remove and refrain from making representations on the Products' packaging or elsewhere that the Products are "100% clean" or "clean";

F.　　Monetary damages and injunctive relief for members of the Class pursuant to California Civil Code § 1780;

G.　　Monetary damages, injunctive relief, and statutory damages in the maximum amount provided by law;

H.　　Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

I.　　An order awarding Plaintiff Tabler and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

J.　　Any further relief that the Court may deem appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff Tabler hereby demands a trial by jury.


DATED: March 29, 2019

COMPLAINT

RICHMAN LAW GROUP

*/s/ Jaimie Mak*
_____
Jaimie Mak (SBN 236505)
Of Counsel
jmak@richmanlawgroup.com
Kim E. Richman (*pro hac vice forthcoming*)
krichman@richmanlawgroup.com
535 Mission Street
San Francisco, CA 94105
Telephone: (718) 705-4579
Facsimile: (718) 228-8522


*Attorneys for Plaintiff*